# 06-40308

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**RONALD E DUFF,**

Plaintiff-Appellee

v.

**WERNER ENTERPRISES, INC.,**
**doing business as Nebraska Werner Enterprises, Inc.;**
**GLEN PATRICK PEER**

Defendants-Appellants,

*Appeal from the United States District Court*
*For the Eastern District of Texas*

### RECORD EXCERPTS OF BRIEF FOR APPELLEE

U.S. COURT OF APPEALS
**FILED**

JUL 0 7 2006

CHARLES R. FULBRUGE III
CLERK

Jack Washburn
State Bar No. 20897010
Murphrey & Washburn
820 Gessner, Suite 1560
Houston, Texas 77024
Telephone: (713) 827-0505
Fax: (713) 827-0560

**ATTORNEY FOR APPELLEE**

NO. 06-40308

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

RONALD E DUFF,

Plaintiff-Appellee

v.

WERNER ENTERPRISES, INC.,
doing business as Nebraska Werner Enterprises, Inc.;
GLEN PATRICK PEER

Defendants-Appellants,

*Appeal from the United States District Court
For the Eastern District of Texas*

## RECORD EXCERPTS OF BRIEF FOR APPELLEE

Jack Washburn
State Bar No. 20897010
Murphrey & Washburn
820 Gessner, Suite 1560
Houston, Texas 77024
Telephone: (713) 827-0505
Fax: (713) 827-0560

ATTORNEY FOR APPELLEE

# RECORD EXCERPTS

1. Excerpts of Plaintiffs Exhibit No. 1
   Department of Public Safety Interoffice Memorandum (3 pages)

2. Plaintiffs Exhibit 4-a

3. Excerpts of trial testimony of Dr. Vivek Kushwaha
   31 – 34, 40 – 41, 44 – 48, 51, 53 – 54, 70 – 71, 74 – 75, 77, 83, 86

4. Certificate of Service



# TEXAS DEPARTMENT OF PUBLIC SAFETY
# INTEROFFICE MEMORANDUM

**To:** Captain Cleatis R. Buckaloo, Texas Rangers, Company A      **Date:** 03-20-04

**From:** Trooper I, Rae Shel Lee, Highway Patrol, Livingston      **Division:** THP

**Subject:** Fleet Accident on 03-17-04 Involving DPS Unit # C01-401, Driven by Sgt. Ronald E. Duff

I have investigated the accident noted above and herewith submit my report.

## VEHICLES AND OCCUPANTS

#1 2001 Chevrolet Impala, 4-door sedan, Unit # C01-401, TX LP M94-SFC, VIN# 2G1WF55E619289962, registered owner Pearson Transfer and Storage, 3000 S. Fires St., Lufkin, TX 75901. Driven by Sergeant Ronald Earl Duff, TX DL# 10469862. Duty Station Livingston, no other passengers.

#2 2002 Freightliner Truck-Tractor, NE LP 77479, VIN # 1FUJAHCG42PG29176, registered owner Werner Enterprises Inc., 14507 Frontier Rd., Omaha, NE, 68138. Driven by Glen Patrick Peer, MI dl # P600282676924, no other passengers. This unit was towing a 1994 Wabash Box Trailer, NE LP# 56078, VIN# 1JJV532Y1RL223145, registered owner Werner Enterprises Inc., 14507 Frontier Rd., Omaha, NE, 68138.

## ACCIDENT LOCATION

The location of the accident was US 59 Northbound in front of the Exxon Truck Stop in Goodrich, TX. The scene is located 2.6 miles south of the Livingston City Limits and .3 miles south of Mile Post 440.

## INVESTIGATION

On Wednesday, 03-17-04, at approximately 7:10 PM, I was notified of a major accident on US 59 NB in front of the Exxon Truck Stop in Goodrich. When I arrived at the scene, I saw that a blue Werner Enterprises truck-tractor and trailer were blocking both northbound lanes of US 59. The front of the truck tractor was in the cross-over median near the left (inside) lane of US 59 SB. I saw that a silver Chevrolet Impala was crushed beneath the trailer, behind the rear axles, facing north. I learned that the driver of the Impala was Sgt. Ron Duff, Texas Ranger and that he was unable to free himself from the vehicle. I spoke to Duff and he advised that he was not hurt, just unable to get out. The Impala was severely damaged to the front and the top was crushed down into the passenger compartment. In the investigation, I learned that Duff was responding to a manhunt in Zavalla.

There were two visible skid marks on US 59 leading from the left (inside) lane, across the right lane, paved shoulder, and into the parking lot, leading to the area of impact. This evidence indicated to me that Ranger Duff was taking evasive action to avoid collision. The Werner Enterprises driver advised that he was unaware of any oncoming traffic and did not feel an impact.

## INVESTIGATOR'S CONCLUSION

Based on physical evidence left at the scene and witness statements, it is my opinion that the driver of the truck-tractor failed to yield the right-of-way to oncoming traffic. The driver of the truck-tractor could not possibly have had a sure clear view of approaching traffic hazards, due to Ranger Duff's vehicle being blocked from his view by another truck-tractor turning into the parking lot. Duff took evasive action to the right to avoid collision, but was unable to clear the end of the trailer. Observation from the cab of a truck tractor should have allowed the driver to see oncoming traffic for approximately one-half mile with no view obstructions. It is my opinion that the driver did not wait for a visual obstruction to clear prior to pulling across the roadway into the path of oncoming traffic.



DUFF 024

PAVED TURN LANE

GRASSY MEDIAN

CROSS-OVER MEDIAN

GRASS

PAVED TURN LANE

US 59

(0,0)

DRAG MARKS FROM TIRES

ISLAND CURB

DATE: 03-17-04
TIME: 7:09 PM
COUNTY: POLK
INV. BY: TRP. I RAE SHEL LEE
DRAWN BY: TRP. I RAE SHEL LEE
SCALE: 1"=20'

UNIT #1: 2001 CHEVROLET IMPALA
DRIVER #1: RONALD E. DUFF
UNIT #2: 2001 FREIGHTLINER TT
TOWING: 1994 WABASH BOX TRAILER
DRIVER #2: GLEN PATRICK PEER

PARKING LOT EXXON TRUCK STOP

N





PLAINTIFF'S
EXHIBIT
4-A



1   Q.     DR. KUSHWAHA, MY NAME IS JACK WASHBURN.  I AM THE

2   ATTORNEY REPRESENTING A GENTELMAN NAMED RONALD DUFF WHO I

3   UNDERSTAND IS ONE OF YOUR PATIENTS; IS THAT CORRECT?

4   A.     YES.

5   Q.     I'M REPRESENTING MR. DUFF, DR. KUSHWAHA, IN A CIVIL

6   LAWSUIT THAT'S FILED IN FEDERAL COURT IN THE EASTERN DISTRICT

7   OF TEXAS IN BEAUMONT.  I'M HERE TO TAKE YOUR DEPOSITION, SIR,

8   REGARDING YOUR TREATMENT OF MR. DUFF FOR APPROXIMATELY THE LAST

9   15 MONTHS.  DO YOU UNDERSTAND THAT?

10   A.     YES, SIR.

11   Q.     OKAY.  I WILL BE ASKING YOU QUESTIONS, DR. KUSHWAHA,

12   REGARDING YOUR DIAGNOSIS OF MR. DUFF, THE TREATMENT THAT YOU

13   GAVE AND THE PROGNOSIS OF MR. DUFF BASED UPON YOUR MOST RECENT

14   EVALUATION IN CONNECTION WITH THE NECK INJURY HE SUSTAINED IN

15   THE CAR WRECK IN MARCH OF 2004.  AND I UNDERSTAND YOU HAVE BEEN

16   TREATING HIM FOR THAT; IS THAT CORRECT?

17   A.     YES.

18   Q.     DR. KUSHWAHA, IN ORDER FOR ME TO ASK YOU QUESTIONS

19   REGARDING MEDICAL FACTS AND OPINIONS, I NEED TO COVER VERY

20   BRIEFLY YOUR QUALIFICATIONS TO -- TO TREAT -- DIAGNOSE AND

21   TREAT SPINAL DISORDERS.  COULD YOU SUMMARIZE FOR US YOUR

22   EDUCATION, TRAINING AND EXPERIENCE IN ORTHOPEDIC SURGERY?

23   A.     YES.  I DID MY RESIDENCY IN ORTHOPEDIC SURGERY AT UCLA,

24   UNIVERSITY OF CALIFORNIA, LOS ANGELES.  I DID A SPINE SURGERY

25   FELLOWSHIP ALSO IN LOS ANGELES AT A SPINAL CORD INJURY HOSPITAL

1   THERE AFFILIATED WITH U.S.C. I'VE BEEN IN PRACTICE HERE IN

2   HOUSTON. I'M IN MY 9TH YEAR OF PRACTICE NOW. I AM ON THE

3   FACULTY OF U.T. FOR THE LAST TWO YEARS, I'VE BEEN CHIEF OF THE

4   SPINE SURGERY FOR U.T. AND HERMANN HOSPITAL. I NOW HAVE

5   STEPPED OUT OF THAT POSITION TO -- TO DO SOME OTHER THINGS, BUT

6   I DO A HUNDRED PERCENT SPINE SURGERY.

7   Q.      OKAY. YOU ARE A LICENSED MEDICAL DOCTOR, OF COURSE?

8   A.      YES.

9   Q.      ALL RIGHT. AND YOUR SPECIALTY HAS BEEN IN ORTHOPEDICS.

10  IN -- IN GENERAL, WHAT DOES THE FIELD OF ORTHOPEDICS INVOLVE?

11  A.      IT INVOLVES TREATMENT OF DISORDERS OF THE BONES AND

12  JOINTS AND MUSCULOSKELETAL SYSTEM.

13  Q.      DO ALL ORTHOPEDIC SURGEONS DO SPINE SURGERY?

14  A.      NO.

15  Q.      IS IT A SUBSPECIALTY WITHIN ORTHOPEDICS?

16  A.      YES.

17  Q.      ALL RIGHT. YOU ARE BOARD CERTIFIED IN ORTHOPEDICS; IS

18  THAT CORRECT?

19  A.      YES.

20  Q.      AND WHEN DID YOU PASS YOUR BOARDS?

21  A.      1999.

22  Q.      DID THAT INVOLVE A -- A CERTAIN AMOUNT OF TESTING,

23  EDUCATION AND TRAINING ABOVE THAT WHICH YOU HAD TO GET TO GET

24  YOUR LICENSE TO PRACTICE AS AN ORTHOPEDIC SURGEON?

25  A.      YES.

1  Q.      WHAT -- IN GENERAL, WHAT WERE YOUR RESPONSIBILITIES AS

2  CHIEF OF SPINE SURGERY FOR U.T. HERMANN?

3  A.      I ORGANIZED THE TEACHING OF THE RESIDENTS, THE

4  FELLOWSHIP FOR THE -- WE HAVE A FELLOWSHIP FOR SPINE SURGERY AS

5  WELL, SETTING PROTOCOLS AND -- AND TAKING CARE OF ANY PROBLEM

6  THAT MIGHT OCCUR WITH SPINE THE SERVICE THERE.

7  Q.      OKAY.  YOU'VE GOT A U.T. BADGE ON YOUR -- YOUR MEDICAL

8  JACKET THERE.  YOU'RE STILL ON THE FACULTY OF U.T.?

9  A.      I'M ON THE CLINICAL FACULTY.

10 Q.      OKAY.  SO DO YOU -- YOU'VE HAD EXPERIENCE IN TEACHING

11 ASPIRING SURGEONS --

12 A.      YES.

13 Q.      -- THE PROPER WAY TO DIAGNOSE AND TREAT SPINAL

14 DISORDERS?

15 A.      YES.

16 Q.      SO YOU'RE -- I TAKE IT FROM THAT YOU'RE FAMILIAR WITH

17 THE APPROACH THAT WOULD BE TAKEN BY A SPINAL SURGEON IN THE

18 DIAGNOSING AND TREATING OF SPINAL DISORDERS?

19 A.      YES.

20 Q.      DR. KUSHWAHA, YOU HAVE A C.V.  DO YOU HAVE A COPY WITH

21 YOU?

22 A.      YES.

23 Q.      YOU PRACTICE HERE WITH ORTHOPEDIC ASSOCIATES.  THAT'S A

24 GROUP OF ORTHOPEDIC SURGEONS HERE IN THE HERMANN PROFESSIONAL

25 BUILDING, CORRECT?

1   A.     YES.

2   Q.     ARE -- ARE THE OTHER DOCTORS AT ORTHOPEDIC ASSOCIATES

3   ALSO AFFILIATED WITH UNIVERSITY OF TEXAS MEDICAL SCHOOL?

4   A.     YES.

5   Q.     ARE THEY ALSO ON THE CLINICAL FACULTY?

6   A.     YES.

7   Q.     ALL RIGHT. HOW MANY YEARS' EXPERIENCE, DR. KUSHWAHA, DO

8   YOU HAVE IN ORTHOPEDICS?

9   A.     WELL, I'M IN THE NINTH YEAR OF MY PRACTICE.

10   Q.     OKAY. WOULD YOU HAVE ANY ESTIMATE THE NUMBER OF -- OF

11   SURGICAL PROCEDURES THAT YOU'VE BEEN INVOLVED IN --

12   A.     NO.

13   Q.     -- DURING THAT TIME AS WELL AS YOUR RESIDENCY?

14   A.     THOUSANDS.

15   Q.     OKAY. DOCTOR, IF YOU'RE ASKED TO RENDER A MEDICAL

16   OPINION TODAY, WOULD YOU AGREE TO FIRST UTILIZE YOUR

17   EXPERIENCE, EDUCATION AND TRAINING AS A BOARD CERTIFIED

18   ORTHOPEDIC SURGEON IN FORMING THOSE OPINIONS; AND WILL YOU

19   AGREE TO GIVE THOSE OPINIONS IN REASONABLE MEDICAL PROBABILITY?

20   A.     YES.

21   Q.     ALL RIGHT. YOU ARE RONALD DUFF'S TREATING DOCTOR. YOU

22   HAVEN'T BEEN HIRED BY ME OR ANYONE PRIVATELY TO REVIEW RECORDS

23   OR TESTIFY IN THIS CASE; IS THAT CORRECT?

24   A.     YES.

25   Q.     OKAY. YOU AND I MET FOR A COUPLE OF MINUTES BEFORE YOUR

1  A.    YES.

2  Q.    AND WHAT ABNORMALITIES DID YOU IDENTIFY?

3  A.    WELL, THE MOST ACUTE ONE WAS THE -- WAS THE INJURY TO

4  THE VERTEBRA WHERE IT IS COMPRESSED; AND THERE IS A PIECE THAT

5  IS BROKEN OFF RIGHT THERE.

6  Q.    SO THERE'S ACTUALLY A PIECE OF BONE BROKEN OFF FROM THE

7  VERTEBRA?

8  A.    YES.

9  Q.    ALL RIGHT.  DR. KUSHWAHA, COULD YOU TAKE THIS PERMANENT

10  MARKER AND DRAW AN ARROW TO THE PIECE OF BONE THAT WAS BROKEN

11  OFF OF THE VERTEBRA?

12  A.    (WITNESS COMPLIES).

13  Q.    ALL RIGHT.  AND HOW CAN YOU TELL LOOKING AT THAT X-RAY,

14  DR. KUSHWAHA, THAT THE VERTEBRA IS ACTUALLY COMPRESSED AND

15  CRUSHED?

16  A.    WELL, NORMALLY THE VERTEBRAE ARE A SQUARE SHAPE LIKE

17  THIS ONE; AND THIS ONE IS MORE TRAPEZOIDAL AS IF SOMEONE TOOK A

18  HAMMER AND CRUNCHED IT DOWN.

19  Q.    OKAY.  AND -- AND WHAT IS THE APPEARANCE OF -- I KNOW

20  THE VERTEBRAE GO BY NUMBER.  SO WHICH -- WHICH NUMBER OF THE

21  CERVICAL VERTEBRA IS ACTUALLY THE DAMAGED ONE ON MR. DUFF?

22  A.    C-7.

23  Q.    OKAY.  COULD I BURDEN YOU, DOCTOR, TO WRITE "C-7" INSIDE

24  THE VERTEBRA THAT'S BEEN INJURED?

25  A.    (WITNESS COMPLIES).

1  Q.    OKAY.  ALL RIGHT.  NOW, I THINK THE TERM THAT HAS BEEN

2  USED IS "COMPRESSION FRACTURE"; IS THAT CORRECT?

3  A.    YES.

4  Q.    ARE THERE PIECES -- OBVIOUSLY THERE'S ONE PIECE OF THAT

5  VERTEBRA THAT'S ACTUALLY BROKEN OFF THE EDGE OF IT?

6  A.    YES.

7  Q.    ARE THERE OTHER BREAKS OR FRAGMENTS IN THE VERTEBRA THAT

8  -- TO HAVE ALLOWED IT TO CRUSH LIKE THAT?

9  A.    YES.

10 Q.    OKAY.  ALL RIGHT.  NOW, WHEN THAT VERTEBRA HEALS, WILL

11 IT GO BACK TO ITS NORMAL POSITION?

12 A.    NO.

13 Q.    WAS THE DAMAGE TO THE C-7 VERTEBRA, DR. KUSHWAHA, THAT

14 YOU SEE ON THE X-RAY CONSISTENT WITH YOUR PHYSICAL EXAMINATION

15 OF MR. DUFF?

16 A.    YES.

17 Q.    WAS THE ABNORMALITY IN THE C-7 VERTEBRA, DR. KUSHWAHA,

18 CONSISTENT WITH THE SYMPTOMS THAT MR. DUFF REPORTED TO YOU IN

19 YOUR CLINICAL HISTORY?

20 A.    YES.

21 Q.    ALL RIGHT.  AND DID YOU FORM A DIAGNOSIS OF MR. DUFF'S

22 CONDITION BASED UPON THE X-RAYS, YOUR EXAMINATION AND THE

23 CLINICAL HISTORY MR. DUFF GAVE?

24 A.    YES.

25 Q.    AND WHAT WAS THAT DIAGNOSIS?

1  A.    YES.

2  Q.    AND WHAT DID MR. DUFF REPORT?

3  A.    HE THINKS THAT HE HAD IMPROVED, AND HE WAS READY TO GO

4  BACK TO WORK.

5  Q.    DID MR. DUFF ALWAYS INDICATE TO YOU A WILLINGNESS TO GO

6  BACK TO WORK?

7  A.    YES.

8  Q.    DID HE EVER ASK YOU TO KEEP HIM OFF WORK WHEN YOU DIDN'T

9  FEEL LIKE HE SHOULD BE OFF WORK?

10  A.    NO.

11  Q.    HAS MR. DUFF BEEN A -- A COOPERATIVE AND COMPLIANT

12  PATIENT?

13  A.    YES.

14  Q.    HAS HE DONE ANYTHING IN YOUR TRAINING VIEW TO SLOW DOWN

15  OR INTERFERE IN ANY -- ANY WAY AT ALL WITH HIS RECOVERY?

16  A.    NO.

17  Q.    OKAY.  DID YOU WANT TO SEE MR. DUFF A COUPLE OF MONTHS,

18  IT LOOKS LIKE, AFTER HE WENT BACK TO WORK; IS THAT CORRECT?

19  A.    YES.

20  Q.    YOU SAW HIM AGAIN WHEN, DR. KUSHWAHA?

21  A.    IN AUGUST OF 2004.

22  Q.    WHAT DID MR. DUFF REPORT TO YOU THEN?

23  A.    AT THAT POINT HE WAS ABLE TO WORK, BUT HE STILL HAD

24  SIGNIFICANT RESIDUAL PAIN IN THE NECK AND GOING OVER THE

25  SHOULDER.

1   Q.     OKAY.  HOW -- HOW DOES THE AMOUNT OF PHYSICAL ACTIVITY

2   THAT A PATIENT HAS WITH A CERVICAL COMPRESSION FRACTURE AFFECT

3   THEIR AMOUNT OF PAIN OR DISCOMFORT?

4   A.     WELL, I THINK THE MORE YOU DO, THE MORE PAIN YOU WILL

5   HAVE.

6   Q.     WOULD THAT EXPLAIN WHY MR. DUFF WAS DOING SO WELL WHILE

7   HE WAS OFF WORK ON PHYSICAL THERAPY AND WAS HAVING TROUBLE

8   TWO MONTHS LATER?

9   A.     YES.

10   Q.     I MEAN, DID -- DID YOU FIND THAT TO BE ABNORMAL OR

11   UNUSUAL AT ALL THAT HE HAD RESPONDED SO WELL DURING PHYSICAL

12   THERAPY BUT WAS HAVING TROUBLE SIX WEEKS AFTER HE WENT BACK TO

13   WORK?

14   A.     NO.

15   Q.     OKAY.  WHAT OPTIONS WERE AVAILABLE TO MR. DUFF WHEN HE

16   CAME BACK IN AUGUST OF 2004?

17   A.     AT THAT POINT I SENT HIM FOR INJECTIONS TO -- TO HELP

18   RELIEVE THE PAIN.

19   Q.     OKAY.  I UNDERSTAND THAT WAS DR. HEIDI SEIFERT, IS THAT

20   CORRECT?

21   A.     YES.

22   Q.     AND SHE HAS A PAIN MANAGEMENT CLINIC IN THE -- ST. JO?

23   A.     YES.

24   Q.     OKAY.  WOULD YOU DESCRIBE FOR US, DR. KUSHWAHA, WHAT --

25   I BELIEVE THEY ARE CALLED STEROID -- OR EPIDURAL STEROID

1  INJECTIONS --

2  A.      YES.

3  Q.      -- WHAT THEY ENTAIL AND WHAT YOUR OBJECTIVE IS?

4  A.      WELL, THE BONE HAD HEALED; BUT HE STILL HAD PAIN IN THE

5  AREA, WHICH I THINK WAS COMING FROM THE FACT THAT THE NERVES IN

6  HIS SPINE WERE STILL IRRITATED AND INFLAMED.  AND SO WHAT THE

7  INJECTIONS DO IS TO HELP REDUCE THAT SWELLING AND INFLAMMATION

8  AROUND THE NERVES, AND SO THAT INVOLVES USUALLY A NEEDLE PLACED

9  UNDER X-RAY VISION INTO THAT AREA AND -- AND THEN A SMALL

10  AMOUNT OF MEDICATION IS PLACED FOR -- TO REDUCE THE PAIN.

11  Q.      IF A PATIENT RESPONDS WITH IMMEDIATE DIMINISHMENT OF

12  PAIN BUT THEN THAT -- THE -- THE BENEFITS OF THE STEROID

13  INJECTION START TO WEAR OFF AFTER A WEEK OR 10 DAYS, WHAT DOES

14  THAT TELL YOU CLINICALLY ABOUT THE CAUSE OF THAT PATIENT'S

15  PAIN?

16  A.      WELL, IT -- IT TELLS YOU THAT THE CAUSE OF THE PAIN IS

17  REVERSIBLE IN THE SENSE THAT IT CAN BE REMOVED; BUT IT -- IT

18  OBVIOUSLY IS PERSISTENT.

19  Q.      OKAY.  ARE STEROID INJECTIONS A PERMANENT CURE FOR

20  CERVICAL PAIN?

21  A.      NO.

22  Q.      MR. DUFF WENT THROUGH A SERIES OF THREE?

23  A.      YES.

24  Q.      AS I UNDERSTAND, HAD -- HAD VERY GOOD EFFECTS FROM THEM

25  DURING THE TIME HE WAS TAKING THEM BUT THEY STARTED TO WEAR OFF

1   A FEW WEEKS LATER.  IS THAT PRETTY COMMON?

2   A.      YES.

3   Q.      WHY CAN'T YOU SIMPLY CONTINUE THE PATIENT ON STEROID

4   INJECTIONS EVERY MONTH FOREVER?

5   A.      WELL, IT'S NOT CONVENIENT TO GET; AND IT IS -- AT SOME

6   POINT IT IS HARMFUL.  THE STEROID IS HARMFUL TO THE SKIN AND

7   THE SOFT TISSUES AND THE -- AND THE -- AND THE TISSUES THERE.

8   Q.      DID MR. DUFF COME AND SEE YOU AFTER HE HAD COMPLETED HIS

9   --HIS COURSE OF STEROID INJECTIONS, DOCTOR?

10  A.      YES.

11  Q.      AND WHEN WAS THAT?

12  A.      IN FEBRUARY OF 2005.

13  Q.      OKAY.  AND YOU EXAMINED MR. DUFF AT THAT TIME?

14  A.      YES.

15  Q.      AND WHAT DID YOUR EXAMINATION DETERMINE?

16  A.      WELL, AT THAT POINT HE STILL HAD RESIDUAL PAIN AND

17  LIMITATION OF MOTION.  SO, YOU KNOW, HE HAD ALREADY COMPLETED

18  PHYSICAL THERAPY AND THE INJECTIONS; AND SO THE ONLY OTHER

19  OPTION WOULD BE A SURGERY.

20  Q.      OKAY.  AND WHAT TYPE OF SURGERY WOULD BE THE APPROPRIATE

21  TREATMENT FOR PAIN FROM A COMPRESSION FRACTURE?

22  A.      WELL, WHAT WOULD NEED TO BE DONE IS THE DISK IN THAT

23  AREA WOULD NEED TO BE REMOVED, ANY RESIDUAL BONE SPURS OR

24  COMPRESSION OF THE NERVE WOULD NEED TO BE REMOVED, AND THEN

25  THAT AREA WOULD NEED TO BE FUSED.

1  Q.     OKAY. AND WHAT'S THE MEDICAL TERM OR THE SURGICAL TERM

2  FOR THAT?

3  A.     THAT'S CALLED A ANTERIOR CERVICAL DISCECTOMY AND FUSION.

4  Q.     OKAY. COULD YOU POINT TO THE X-RAY, DR. KUSHWAHA, AND

5  SHOW US THE PARTS OF THE NECK THAT WOULD BE INVOLVED IN THAT --

6  THAT SURGICAL PROCEDURE?

7  A.     WELL, FOR HIM, WE WOULD NEED TO DO SURGERY FROM C-4 HERE

8  TO C-7. I WOULD REMOVE THESE THREE DISKS. I WOULD REMOVE BONE

9  SPURS AT EACH OF THOSE LEVELS, AND I WOULD PUT IN A BONE GRAFT

10 INTO EACH DISK SPACE AND THEN A PLATE THAT WOULD GO OVER THE

11 TOP.

12 Q.     ALL RIGHT. AND -- AND IN ORDER TO -- TO GET TO THAT

13 PART OF THE NECK, IS THAT DONE THROUGH THE FRONT, THROUGH THE

14 PATIENT'S THROAT?

15 A.     YES.

16 Q.     OKAY. THE PATIENT IS LAYING ON THEIR BACK, AND YOU

17 ACTUALLY MAKE AN INCISION ROUGHLY WHERE THEIR -- THEIR LARYNX

18 IS?

19 A.     YES.

20 Q.     WHY IS A PLATE NECESSARY?

21 A.     WELL, IT'S NOT NECESSARY; BUT IT DOES HELP TO IMMOBILIZE

22 THE AREA AND ACCELERATE THE HEALING AND INCREASE THE CHANCES OF

23 HEALING.

24 Q.     OKAY. WHY WOULD IT BE NECESSARY, DR. KUSHWAHA, TO

25 REMOVE THE DISK FROM THE -- THE VERTEBRA ABOVE THE ONE THAT'S

1  PERMANENT DAMAGE TO THEM SUCH THAT EVEN AFTER YOU FREE THEM UP,

2  IT -- IT STILL HURTS. IT'S NOT NORMAL TO HAVE THREE DISKS

3  REMOVED AND FUSED, AND SO SOMETIMES WE MAY REMOVE THE PAINFUL

4  PART BUT YOUR NECK IS CHANGED AND DIFFERENT AND SOMETIMES THAT

5  ALSO IS PAINFUL. THE REASON WHY THE SURGERY WORKS IS THAT THE

6  NEW PAIN IS USUALLY LESS THAN THE OLD PAIN.

7       AND THEN, OF COURSE, THERE ARE THE INHERENT RISKS OF THE

8  SURGERY ITSELF, BLEEDING, INFECTION, DAMAGE TO THE ESOPHAGUS OR

9  EVEN THE SPINAL CORD OR VOCAL CORDS.

10 Q.    YOU DON'T BEGRUDGE MR. DUFF FOR BEING CAUTIOUS ABOUT

11 MAKING THE DECISION ON -- ON HAVING THE PROCEDURE AND WHEN HE'S

12 HAVING IT?

13 A.    YES.

14 Q.    IN -- IN TERMS OF PHYSICAL ABILITY ONCE THIS PROCEDURE

15 IS DONE, ASSUMING IT'S SUCCESSFUL, DOES A PATIENT WITH A -- I

16 GUESS, IT WOULD BE CONSIDERED A THREE-LEVEL FUSION -- DOES A

17 PATIENT WITH A THREE-LEVEL CERVICAL FUSION HAVE AS MUCH

18 MOVEMENT IN THEIR NECK AFTER THE FUSION AS -- AS THEY DID WITH

19 A HEALTHY NECK?

20 A.    WELL, A HEALTHY NECK, NO; BUT HIS NECK IS NOT HEALTHY

21 RIGHT NOW. SO I SUSPECT IT WOULD -- EVEN WITH A THREE-LEVEL

22 FUSION, HIS RANGE OF MOTION WILL NOT BE TOO DIFFERENT AFTER THE

23 SURGERY. OBVIOUSLY BEFORE HIS NECK PROBLEM STARTED, IF YOU

24 COMPARE IT TO THAT, THEN, YES, THERE'S A LIMITATION.

25 Q.    SO --

1   HEAL?

2   A.      COUPLE OF MONTHS.

3   Q.      OKAY.  SO OBVIOUSLY WHEN YOU SAW MR. DUFF IN APRIL, HE

4   HAD A RECENT FRACTURE.  WOULD THAT BE FAIR TO SAY?

5   A.      YES.  IT WAS, I THINK, THREE WEEKS.

6   Q.      OKAY.  DID YOU ELICIT ANYTHING ELSE FROM YOUR REVIEW OF

7   THE RECORDS OR YOUR HISTORY OF MR. DUFF THAT WOULD EXPLAIN THE

8   CAUSE OF THIS COMPRESSION FRACTURE ASIDE FROM THE WRECK WITH

9   THE TRUCK IN MARCH OF 2004?

10  A.      NO.

11  Q.      DO YOU HAVE A -- AN OPINION CONCERNING THE CAUSE OF MR.

12  DUFF'S COMPRESSION FRACTURE?

13  A.      I THINK IT WAS THE ACCIDENT.

14  Q.      THE ACCIDENT IN MARCH OF 2004?

15  A.      YES.

16  Q.      ALL RIGHT, SIR.

17          DO YOU HAVE AN OPINION, DR. KUSHWAHA, REGARDING THE

18  CAUSE OF THE SYMPTOMS THAT MR. DUFF HAS TODAY THAT ARE GOING TO

19  REQUIRE THIS SURGERY IN DECEMBER?

20  A.      YES.  THE ACCIDENT IN MARCH OF 2004.

21  Q.      AND DO YOU HAVE AN OPINION, DR. KUSHWAHA, BASED UPON

22  YOUR EDUCATION, TRAINING AND EXPERIENCE AND YOUR APPLICATION OF

23  THE APPROACH OF AN ORTHOPEDIC SURGEON TO A PATIENT WITH MR.

24  DUFF'S SYMPTOMS CONCERNING THE CAUSE OF THOSE SYMPTOMS?

25  A.      YES.

1    Q.     AND WHAT IS THAT OPINION?

2    A.     THE ACCIDENT.

3    Q.     AND PARTICULARLY WHAT FROM THE ACCIDENT?

4    A.     THE INJURY TO HIS NECK.

5    Q.     THE -- THE COMPRESSION FRACTURE?

6    A.     YES.

7    Q.     ALL RIGHT. NOW, REGARDING COST IN 2005 DOLLARS,

8 DOCTOR, AS AN ORTHOPEDIC SPINE SURGEON AND -- AND AS A FACULTY

9 MEMBER OF U.T. AND -- AND ON THE STAFF HERMANN, ARE YOU

10 FAMILIAR WITH THE GENERAL COSTS, INCLUDING SURGICAL FEES,

11 HOSPITAL STAY AND ANESTHESIOLOGY OF AN ANTERIOR CERVICAL

12 FUSION?

13    A.     YES.

14    Q.     IN TODAY'S DOLLARS, DR. KUSHWAHA, HOW MUCH IS THAT?

15    A.     IT'S ABOUT $40,000.

16    Q.     OKAY. AND ABOUT HOW MANY MONTHS OFF WORK?

17    A.     FOR HIM TO GO BACK FULL DUTY, HE'LL BE OFF WORK FOUR

18 MONTHS.

19            (END OF PLAINTIFF'S PORTION OF THE VIDEO)

20           MR. WASHBURN: PASS THE WITNESS, JUDGE.

21    (WHEREUPON THE DEFENDANTS' PORTION OF THE VIDEO WAS PLAYED)

22    Q.     AND DID MR. DUFF GO TO PHYSICAL THERAPY?

23    A.     YES.

24    Q.     DID HE COMPLETE PHYSICAL THERAPY?

25    A.     YES.

1    A.    THAT'S TRUE.

2    Q.    DO YOU HAVE ANY EVIDENCE THAT ANY OTHER DOCTOR OR

3    HEALTHCARE PROVIDER HAS PRESCRIBED PRESCRIPTION PAIN MEDICATION

4    IN THIS LAST 16 MONTHS FOR MR. DUFF?

5    A.    I DON'T KNOW THAT THEY HAVE.

6    Q.    SO THE ONLY EVIDENCE THAT -- THAT WE HAVE THAT HE'S

7    TAKEN ANYTHING FOR PAIN IN THE 16 MONTHS SINCE THIS ACCIDENT

8    HAS BEEN HIS DEPOSITION TESTIMONY WHERE HE SAID HE TAKES

9    TYLENOL AFTER WORKING ON HIS MOTHER-IN-LAW'S FARM ALL DAY, IS

10   THAT RIGHT, ASSUMING THAT -- THAT THAT'S IN HIS DEPOSITION?

11   A.    I SUPPOSE SO.

12   Q.    BUT CERTAINLY HE'S -- HE'S -- BASED ON THE EVIDENCE,

13   HE'S ABLE TO -- OR HE HAS BEEN IN THE LAST 13 MONTHS ABLE TO

14   FUNCTION ON THE JOB WITHOUT PAIN MEDICATION?

15   A.    YES.

16   Q.    DOCTOR, IN REVIEWING YOUR RECORDS THAT YOU PRODUCED

17   TODAY, THERE ARE SOME RECORDS THAT I HAD NEVER SEEN BEFORE; AND

18   THE FIRST IS A LETTER DATED APRIL 13TH, 2005, THAT YOU WROTE

19   "TO WHOM IT MAY CONCERN." DO YOU KNOW WHY YOU WROTE THAT

20   LETTER?

21   A.    I THINK HE HAD ASKED ME TO DO THAT.

22   Q.    THIS -- THIS INDICATES, THE THIRD PARAGRAPH, THAT HE WAS

23   SCHEDULED TO GET ONE MORE INJECTION. DID HE EVER GET THAT

24   INJECTION?

25   A.    I DON'T KNOW. LET'S SEE. NO, I DON'T THINK HE EVER

1   DID.

2   Q.      OKAY.  AND THEN IT SAYS ULTIMATELY HE MAY NEED TO GET A

3   NEW MRI OR PERHAPS A MYELOGRAM TO EVALUATE FOR A POSSIBLE

4   SURGERY.  HAS HE EVER GOTTEN A NEW MRI?

5   A.      NO.  IF HE'S NOT PLANNING TO HAVE SURGERY UNTIL

6   DECEMBER, IT WOULD BE BETTER JUST TO WAIT UNTIL RIGHT BEFORE

7   THEN TO -- TO GET ANY ADDITIONAL TESTS.

8   Q.      AND WHAT ABOUT A MYELOGRAM, HAS HE HAD THAT?

9   A.      NO.

10  Q.      OKAY.  WOULD THESE BE TESTS THAT -- THAT YOU WOULD HAVE

11  TO RUN BEFORE REACHING AN OPINION ABOUT SURGERY?

12  A.      YES.

13  Q.      I NOTICE YOU -- YOU SAY "POSSIBLE SURGERY" --

14  A.      YES.

15  Q.      -- RIGHT?

16          AND IT'S MY UNDERSTANDING THAT EVEN TODAY THERE'S BEEN

17  NO FINAL DECISION CONCERNING WHETHER OR NOT HE'S GOING TO HAVE

18  SURGERY?

19  A.      THAT'S TRUE.

20  Q.      THEN YOU MENTION IN THE LAST PARAGRAPH THAT HIS

21  DIAGNOSIS IS C-7 FRACTURE AND C-4 THROUGH C-7 STENOSIS?

22  A.      YES.

23  Q.      MY QUESTION IS, DOCTOR, IS THAT IF WE LOOK AT THE

24  MARCH 2004 MRI WHICH WAS TAKEN TWO WEEKS AFTER THIS ACCIDENT,

25  THERE'S -- IT -- IT SAYS THAT THERE IS NO FORAMINAL STENOSIS AT

1  Q.    AND THERE'S NO WAY AS YOU AS A DOCTOR CAN COME IN AND

2  SAY, YOU KNOW, THAT -- YOU KNOW, HE SHOULD HAVE A CERTAIN

3  AMOUNT OF PAIN OR HE HAS ENOUGH PAIN TO HAVE SURGERY. I MEAN,

4  YOU'RE RELYING TOTALLY ON THE PATIENT FOR THAT?

5  A.    MOSTLY.

6  Q.    AND IN YOUR FINAL REPORT, WHICH IS JULY 27TH, 2005,

7  WHICH I GUESS IS LAST WEEK, BASICALLY YOU SAY THAT YOU WILL SEE

8  HIM BACK IN THREE MONTHS AND SEE HOW HE IS DOING AT THAT POINT.

9  SO IT APPEARS TO ME THAT AS WE SIT HERE TODAY HIS FUTURE

10  TREATMENT PLAN IS -- IS UNRESOLVED, UNDECIDED?

11  A.    YES.

12  Q.    IN FACT, YOU'RE GOING TO SEE HIM IN THREE MONTHS --

13  WHICH THREE MONTHS WOULD BE NOVEMBER -- AND SEE HOW HE'S DOING

14  AT THAT POINT?

15  A.    YES.

16  Q.    SO AS WE SIT HERE TODAY, THERE'S BEEN NO DECISION TO

17  HAVE SURGERY OR NOT HAVE SURGERY?

18  A.    NO.

19  Q.    IS THAT CORRECT, WHAT I SAID?

20  A.    YES.

21  Q.    OKAY. AND -- AND WE DO KNOW THAT -- THAT MR. DUFF HAS

22  BEEN BACK AT WORK FOR 13 MONTHS AND HAS BEEN, NOT ONLY BACK AT

23  WORK, BUT HAS BEEN WORKING ON HIS MOTHER-IN-LAW'S FARM AND

24  APPARENTLY IS -- IS ABLE TO -- TO DO ALL THOSE THINGS?

25  A.    YES.

1 Q. AND TALKING ABOUT PAIN MEDICATION, THERE ARE PAIN

2 MEDICATIONS THAT DON'T HAVE THE SIDE EFFECTS THAT -- THAT YOU

3 TALKED ABOUT THAT WOULD INTERFERE WITH USING A GUN, AREN'T

4 THERE?

5 A. WELL, THERE ARE ANTI-INFLAMMATORY TYPE MEDICATIONS. YOU

6 KNOW, THERE'S NO MEDICATION THAT DOESN'T HAVE SIDE EFFECTS.

7 Q. WELL, I MEAN, ARE -- ARE THERE MEDICATIONS THAT -- THAT

8 YOU WOULD PRESCRIBE FOR SOMEBODY WHO'S A LAW ENFORCEMENT

9 OFFICER THAT WAS HAVING PAIN AND CAME TO YOU AND SAID, "DOCTOR,

10 I HAVE PAIN. IS THERE SOMETHING YOU CAN GIVE ME THAT'S

11 CONSISTENT WITH MY JOB?" IS THERE SOMETHING?

12 A. YES.

13 Q. AND WHAT WOULD THAT BE?

14 A. MOTRIN, ALEVE, THINGS LIKE THAT.

15 Q. OKAY. SO IF MR. DUFF WAS IN PAIN BUT OBVIOUSLY DIDN'T

16 WANT TO TAKE NARCOTIC-TYPE DRUGS THAT WOULD INTERFERE WITH HIS

17 JUDGMENT AND REASONING, HE COULD HAVE TAKEN A NUMBER OF

18 DIFFERENT MEDICATIONS, CORRECT?

19 A. YES. AND -- AND IT SOUNDS LIKE HE IS IN -- IN THAT HE

20 TAKES THINGS LIKE TYLENOL.

21 Q. WELL, IF YOU REMEMBER, HE WAS TAKING TYLENOL THE DAY

22 AFTER HE WORKED ON HIS MOTHER-IN-LAW'S FARM ALL DAY; BUT I'M

23 TALKING ABOUT ON A DAILY BASIS, I MEAN, THERE'S -- HE COULD BE

24 TAKING MOTRIN. IS THAT RIGHT?

25 A. YES.

1 Q. I MEAN, PAIN IS A VERY SUBJECTIVE THING. SOME PEOPLE

2 ARE IN TERRIBLE PAIN AND IT JUST ALL OF A SUDDEN STOPS, IS THAT

3 CORRECT?

4 A. SOMETIMES THAT HAPPENS.

5 Q. AND -- AND SOMETIMES IT GETS BETTER?

6 A. YES.

7 Q. BUT -- BUT YOU DON'T KNOW THAT ONE WAY OR THE OTHER?

8 A. NO.

9 Q. AND YOU'RE CERTAINLY OPEN TO THE IDEA THAT HE COULD GET

10 BETTER?

11 A. I GUESS THERE'S A POSSIBILITY OF THAT.

12 Q. AND I BELIEVE YOU SAID THAT THE -- THAT YOU BELIEVE IN

13 REASONABLE MEDICAL PROBABILITY THAT IF HE HAS THE SURGERY HE

14 CAN BE BACK TO WORK IN FOUR MONTHS?

15 A. YES.

16 Q. AND THAT MEANS BACK TO WORK IN WHAT HE'S DOING NOW AS A

17 TEXAS RANGER?

18 A. YES.

19 Q. AND WITH A LOT LESS PAIN?

20 A. I THINK SO. OBVIOUSLY, THAT'S NOT A -- YOU KNOW,

21 THERE'S NO GUARANTEE FOR IT. OBVIOUSLY, IF HE HAD A

22 COMPLICATION OR HAD A PROBLEM HEALING, HE MAY NEVER GO BACK TO

23 WORK; BUT THAT'S MY EXPECTATION.

24 Q. WELL, DOCTOR, WOULD YOU DO THE SURGERY IF YOU DIDN'T

25 BELIEVE THAT HE WOULD GET SIGNIFICANT RELIEF?

1    AND IF YOU JUST LOOK AT THE X-RAY, COMPARING JUST THESE X-RAYS

2    THREE WEEKS APART, THIS VERTEBRA HAS COLLAPSED A LITTLE BIT

3    MORE AND HAS CHANGED THE ALIGNMENT OF HIS NECK AND IT'S

4    CREATING MORE STRESS ON ADMITTEDLY PREEXISTING LEVELS; BUT IT'S

5    NOW MADE THEM SYMPTOMATIC.

6    Q.    THAT'S A VERY IMPORTANT POINT YOU MAKE, DOCTOR.

7          I WANT TO MAKE SURE THAT OUR VIDEOGRAPHER HAS -- IS ABLE

8    TO GET BOTH OF THESE TWO X-RAY IMAGES IN HIS SCREEN.

9          AND LET ME -- IF I COULD BOTHER YOU TO DO THAT, ONCE HE

10   GETS IT FOCUSED, POINT OUT TO ME HOW YOU'RE SEEING DIFFERENCES

11   IN THE ALIGNMENT OF THE VERTEBRA IN THE --

12   A.    THIS --

13   Q.      -- TWO X-RAYS.

14   A.    THIS C-7 VERTEBRA LOOKS MORE LIKE A SQUARE BECAUSE IT'S

15   NOT --EVEN THOUGH IT'S INJURED, IT'S NOT YET COLLAPSED AS MUCH.

16   AS THE BONE HEALS, IT -- IT DOES CONSOLIDATE AND -- AND BECOMES

17   DENSER.  SO IT HEALS, BUT IT HEALS IN A POSITION WHERE IT'S

18   COLLAPSED FURTHER.  SO THAT WILL THEN ALLOW THE -- THE SPINE TO

19   TILT FORWARD MORE AND -- AND RESULT IN A CONDITION WHERE HE

20   LOSES THE NORMAL ALIGNMENT TO HIS NECK.  HE LOSES WHAT WE CALL

21   YOUR CERVICAL LORDOSIS, THAT IS THE NATURAL CURVE TO YOUR

22   SPINE.

23   Q.    IF WE LOOKED AT ONE OF MR. DUFF'S MORE RECENT X-RAYS --

24   THERE'S ONE, I BELIEVE, FROM AUGUST 18TH.  THAT'S 2004.  I

25   SHOULD HAVE -- I MAY NOT HAVE THE MOST RECENT ONE, DR.

1   A.   UH-HUH.

2   Q.   AND THE JURY IS GOING TO BE ASKED ABOUT MR. DUFF'S

3   DAMAGES?

4   A.   RIGHT.

5   Q.   AND THE JURY IS GOING TO BE ASKED WHETHER OR NOT IT'S

6   MORE LIKELY THAN NOT THAT MR. DUFF IS GOING TO HAVE NECK

7   SURGERY?

8   A.   RIGHT.

9   Q.   AND I NEED TO KNOW THAT BASED UPON YOUR EDUCATION,

10  TRAINING, EXPERIENCE, YOU'RE APPLYING THE STANDARD APPROACH OF

11  AN ORTHOPEDIC SURGEON TO A PATIENT WITH MR. DUFF'S SYMPTOMS,

12  WHETHER OR NOT IN REASONABLE MEDICAL PROBABILITY IF MR. DUFF IS

13  READY FOR SURGERY WHETHER YOU WOULD DO THE PROCEDURE?

14  A.   YEAH.  I THINK ANY ADDITIONAL TESTS WOULD BE TO WORK OUT

15  THE DETAILS OF THE SURGERY RATHER THAN TO -- FOR ME TO

16  DETERMINE WHETHER OR NOT SURGERY IS APPROPRIATE.

17  Q.   OKAY.  SO IT'S YOUR OPINION THAT SURGERY IS APPROPRIATE

18  IN MR. DUFF'S CASE?

19  A.   YEAH.  YES.  HE -- LIKE I SAID, HE -- HE IS A CANDIDATE

20  NOW AT THIS POINT.

21                    (VIDEO STOPPED)

22       MR. WASHBURN:  THAT CONCLUDES OUR OFFER OF DR.

23  KUSHWAHA, JUDGE.

24       THE COURT:  ALL RIGHT.

25       MR. FROCK:  I HAVE NOTHING FURTHER OF THIS WITNESS,



## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of July 2006, two true and correct paper and electronic (disc) copies of Appellee's Brief and Record Excerpts were served by hand delivery to Appellant's counsel of record:

> M. David Frock
> State Bar No. 07484800
> Frock and Broussard, P.C.
> 2550 North Loop West Suite 260
> Houston, Texas 77092-8908
> Telephone: (713) 688-2300
> Fax:        (713) 688-2377

Jack Washburn
Attorney for Appellee